UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2012 NOV -2  AM 11: 48

CLERK

BY _____
DEPUTY CLERK

PAUL WRIGHT,                                      )
                                                 )
        Plaintiff,                               )
                                                 )
    v.                                           )        Case No. 5:12-cv-27
                                                 )
DAVE YACOVONE, STEVE DALE,                       )
LISA KELLER, RAYMOND KELLETT,                    )
KELLI ZUMBRUSKI, GYLA DZIOBEK,                   )
and JOHN DOES,                                   )
                                                 )
        Defendants.                              )

## OPINION AND ORDER GRANTING IN PART AND
## DENYING IN PART DEFENDANTS' MOTION TO DISMISS
### (Doc. 3)

Plaintiff Paul Wright brings this civil rights action pursuant to 42 U.S.C. §§ 1983 & 1988 against Defendants Dave Yacovone, Steve Dale, Lisa Keller, Raymond Kellett, Kelli Zumbruski, Gyla Dziobek and John Does (collectively, "Defendants").[1]  Plaintiff alleges that Defendants violated his constitutional rights to procedural due process and equal protection when they substantiated him for child abuse and released a letter informing his ex-wife of the substantiation with the alleged recommendation that she file the letter in Vermont Family Court.

Presently before the court is Defendants' Fed. R. Civ. P. 12(b)(6) motion to dismiss Plaintiff's Complaint for failure to state a claim upon which relief can be granted. (Doc. 3.)  The parties waived oral argument.

---

[1] Plaintiff sues Defendants Steve Dale, Lisa Keller, Raymond Kellett, Kelli Zumbruski, and John Does in both their individual capacities for monetary damages and in their official capacities for injunctive and declaratory relief.  He sues Defendant Dave Yacovone in his official capacity for injunctive and declaratory relief and Defendant Gyla Dziobek in her individual capacity for monetary damages.

Plaintiff is represented by Brian R. Marsicovetere, Esq.  Defendants are represented by Assistant Vermont Attorney General David R. Groff.

## I.      Factual and Procedural Background.

### A.      Plaintiff's Factual Allegations.

Plaintiff is a resident of Brattleboro, Vermont.  On February 11, 2005, Plaintiff and Sandra Judd divorced.  They have two children, C.W., who is fourteen years old and F.W., who is twelve years old.

At all relevant times, Defendant Steve Dale was Commissioner of the Vermont Department of Children and Families ("DCF"); Defendant Lisa Keller was Director of DCF's Brattleboro field office; Defendant Raymond Kellett was a DCF "Casework Supervisor" (Doc. 1 at ¶ 7) in the Brattleboro field office; Defendant Kelli Zumbruski was a DCF caseworker in the Brattleboro field office; and Defendant Gyla Dziobek was a Supervisor in DCF's Central Intake Office.  John Does are currently unknown state officials who engaged in any acts or omissions that gave rise to Plaintiff's claims, and/or who continue to perpetuate the alleged constitutional violations against Plaintiff. Defendant Dave Yacovone is the current Commissioner of DCF.

When Plaintiff and Ms. Judd divorced, Ms. Judd was granted sole legal and physical parental rights and responsibilities with regard to C.W. and F.W. pursuant to the parties' stipulation.  Also pursuant to that stipulation, Plaintiff was granted full access to the children's medical, dental, law enforcement and school records and substantial visitation rights with visitation occurring thereafter on a consistent basis.

In 2008, Ms. Judd sought to move to Oregon with their children.  In response, Plaintiff filed a motion seeking full physical and legal custody because the move would undermine his visitation rights.  Ms. Judd opposed the motion.  Plaintiff alleges that, at the custody hearing, the children's classroom and extracurricular teachers and numerous other individuals testified that Plaintiff had a loving relationship with his children.  He also alleges that at no point did anybody, including Ms. Judd, allege that the children were abused.  The Family Court judge allegedly determined that Ms. Judd could not

move with the children to Oregon, and if she did, Plaintiff would receive full custody of the children.  Ms. Judd did not appeal this decision.

In 2009, Plaintiff discovered that C.W. was seeing a psychiatrist, Dr. Neil Senior, who had prescribed him "Vyvance."  Plaintiff, after consulting with the children's primary care physician, was concerned about the drug's side effects, the quality of C.W.'s mental health treatment, his diagnoses, and whether medication was the best course of treatment.  Plaintiff alleges that he became alarmed at changes in C.W.'s behavior and demeanor that were allegedly consistent with the known side effects of the medication.  Thereafter, at the direction of Ms. Judd, the children's physicians and counselors allegedly ceased communicating with Plaintiff and denied him access to the children's medical records.  In response, Plaintiff filed a verified motion to modify parental rights and responsibilities in the Windham County Superior Court's Family Court Division, requesting medical decision-making authority with regard to the children.

In Ms. Judd's opposition to Plaintiff's motion, she expressed concerns regarding Plaintiff's alleged mistreatment of the children during visits, alleging that the children reported being "'physically restrained at times by their father'" and "'in one instance . . . of being smothered and having difficulty breathing.'"  *Id.* at ¶ 23.  Plaintiff alleges that this was the first time he had been accused of any mistreatment of the children "[d]espite bitterly contested litigation since 2004[.]"  *Id.*  Ms. Judd allegedly told the Family Court that the allegations were not previously brought forth because she feared Plaintiff's retribution against the children.

Following Ms. Judd's allegations of abuse, Plaintiff alleges that, upon information and belief, on April 22, 2010, C.W.'s therapist, Susan Wagner, called DCF and reported that Plaintiff was "controlling and abusive to the kids," was "upset by mom having full custody" and "was currently [suing] for medical decisions regarding the [children] because [he] is opposed to the kids taking medication."  *Id.* at ¶ 25.  Ms. Wagner also reported that C.W. reported to Ms. Judd who reported to Ms. Wagner that Plaintiff "'lies on [F.W.] to restrain [him] to the point that he becomes terrified that he can't breathe and screams.'"  *Id.* at ¶ 26.  According to Ms. Wagner, F.W. became aggressive at school and

3

had nightmares following this alleged incident.[2]   Ms. Wagner allegedly reported a number of other claims regarding Plaintiff's alleged abuse, including accusations that Plaintiff neglected the children and that the children were afraid of him.[3]

In response to the Wagner report, DCF conducted an intake used to determine what level of field response, if any, was necessary and allegedly documented "no report of injur[y]" to the children. *Id.* at ¶ 28.   DCF's intake worker allegedly recommended that Ms. Wagner's allegations not be accepted for assessment or investigation.   Plaintiff is allegedly referred to as an "Arab" in the intake report and only his race or ethnicity is mentioned.   The intake report also lists "cultural factors" as a "contributing factor" to the alleged abuse. *Id.* at 32.

Plaintiff was born and raised in the United States and has no Arab ancestry.   He alleges that "Defendants Dziobek, Keller, Kellett and Zumbruski all believed [Plaintiff]

---

[2] The Complaint states that "the source of this particular hearsay is not known." *Id.* at ¶ 27. Plaintiff attributes Ms. Wagner's report to information provided by Ms. Judd.   Plaintiff further alleges that Ms. Wagner had a financial interest in Plaintiff not obtaining medical decision-making authority because it would allow him to change health care providers.   He alleges that at least two claims made by Ms. Wagner to DCF are demonstrably false: "'Felix had a broken toe and called mom saying that [Plaintiff] wouldn't take him to the doctor;' and . . . '[Plaintiff] is an Arab who may have been raised in the US.'" (Doc. 1 at ¶ 30.)

[3] Ms. Wagner's report includes claims that:

> A.   [F.W.] was not able to find [Plaintiff] for an unspecified amount of time when they visited Universal Studios;
>
> B.   [F.W.'s] lips have been cracked and he has had sores on his tongue after visits with [Plaintiff], and on one visit of unspecified duration he lost two pounds;
>
> C.   [F.W.'s] primary care physician noticed a "drop off in growth rate;"
>
> D.   [F.W.] gets "very agitated" after visits with [Plaintiff];
>
> E.   "The kids tell mom that they are afraid of dad;"
>
> F.   "[B]oth boys told mom that [Plaintiff] told the boys . . . that he would rather pay for their funerals than for child support."

*Id.* at ¶ 29.

was an 'Arab,' and that Arabs are more prone to abuse children due to their race, ethnicity and culture." *Id.* at ¶ 33.

Despite the DCF intake worker's alleged recommendation, Defendants Dziobek and Keller accepted the allegations for an assessment,[4] which Defendant Zumbruski performed.   Plaintiff alleges that they were motivated to do so by their false belief that he was an "Arab" and their further belief that Arabs have a propensity to abuse their children.

On April 29, 2010, Plaintiff alleges that Defendant Zumbruski interviewed Ms. Judd who falsely claimed that she could not afford an attorney to alter the custody order. Plaintiff contends that Defendant Zumbruski failed to verify this claim and that, had she done so, would have discovered that Ms. Judd had been consistently represented by counsel since she filed for divorce in 2004.

On May 6, 2010, Defendant Zumbruski contacted Plaintiff to advise him of an assessment into recent allegations that he abused the children but allegedly refused to provide him with details regarding the allegations.  Plaintiff advised Defendant Zumbruski "that there had been extensive family court proceedings, and that he successfully prevented Ms. Judd from moving to Oregon with the children.  He informed her that there were ample court records, replete with sworn witness testimony . . . available for inspection, and that the allegations of abuse were made in retaliation to his motion for medical decision making authority and were not true." *Id.* at ¶ 40.  Plaintiff advised Defendant Zumbruski that he would need to obtain legal advice, and declined to speak further without notice of the allegations.

---

[4] A DCF "assessment" is:

> A response to a report of child abuse or neglect that focuses on the identification of the strengths and support needs of the child and the family, and any services they may require to improve or restore their well-being and to reduce the risk of future harm. *The child and family assessment does not result in a formal determination as to whether the reported abuse or neglect has occurred.*

33 V.S.A. 4912(17) (emphasis supplied).

On May 14, 2010, Defendant Zumbruski separately interviewed C.W. and F.W., and the principal from F.W.'s school. On that same date, Plaintiff's family law attorney allegedly contacted Defendant Zumbruski who advised that an "assessment" was being conducted but again refused to provide specifics about the allegations.

Plaintiff alleges that Defendant Zumbruski falsely attributed statements to some of the parties she interviewed, including Dr. Senior, F.W.'s teacher, and C.W.'s school counselor. In particular, Plaintiff alleges that Defendant Zumbruski falsely attributed to Dr. Senior a statement about Plaintiff: "This guy is a boy. He is unbelievable," *Id.* at ¶ 42, which in deposition Dr. Senior denied under oath ever making. Plaintiff characterizes the statement falsely attributed to Dr. Senior as "a racist statement that equates the sociological status of adult ethnic men of color with that of male children." *Id.* at ¶ 43.[5]

Plaintiff alleges, upon information and belief, that Defendant Zumbruski falsely claimed that F.W.'s teacher expressed concern that "'something' involving 'the father's home environment' was negatively affecting the children." *Id.* at ¶ 44. He alleges that, upon information and belief, Defendant Zumbruski falsely claimed that C.W.'s school counselor "stated that 'the school' did not believe [C.W.] should be having contact with Mr. Wright." *Id.* at ¶ 45.

On June 4, 2010, Defendant Zumbruski recommended Ms. Wagner's report be substantiated for emotional maltreatment of C.W. and F.W. That same day, Defendant Kellett substantiated Plaintiff for child abuse and then Defendants Kellett and Zumbruski decided to close the case without further action.[6] Under Vermont law, "substantiation"

---

[5] Plaintiff does not actually allege he is an ethnic man of color, which may be an important fact for his racial discrimination claims.

[6] Under Vermont law, after an assessment is completed, DCF generally offers a "plan of services that reduces the risk of harm and improves or restores family well-being" which the family can then accept or decline. 33 V.S.A. § 4915a(a)(3) & (c). "When an assessment case is closed, *there shall be no finding of abuse or neglect* and no indication of the intervention shall be placed in the registry. However, the department shall document the outcome of the assessment." 33 V.S.A. § 4915a(d) (emphasis supplied).

may occur only after an "investigation."[7]  Also on June 4, 2010, Defendants Zumbruski

and Kellett allegedly sent letters to Ms. Judd and Plaintiff.  In the letter to Ms. Judd, they

stated: "In April of 2010, [DCF] received a report of concern that caused us to open an

assessment into the safety of your children [C.W.] and [F.W.].  **Based on information**

**we gathered, we have determined that a reasonable person would conclude that this**

**abuse did occur.**"  *Id.* at ¶ 50.  Plaintiff alleges that Defendant Kellett placed a

handwritten note on the bottom of the letter to Ms. Judd, stating: "Please submit this to

Family Court if you want to modify the visitation order."  *Id.* at ¶ 53.  Plaintiff alleges

that:

> Defendants Kellett and Zumbruski intentionally manufactured false
> evidence -- substantiations for child abuse they knew to be false -- so that
> Ms. Judd could use them as ammunition to modify the family court's
> visitation order and defeat Mr. Wright's attempt to obtain medical
> decision[-]making authority over the children.  They did so because of their
> perception that Mr. Wright was an 'Arab,' and such people are prone to
> abuse children.

*Id.* at ¶ 54.

In the June 4, 2010 letter to Plaintiff, Defendants Zumbruski and Kellett advised

Plaintiff that he had been substantiated for child abuse, "specifically, 'emotional

maltreat[ment]' of [C.W.] and [F.W.,]'" *id.* at ¶ 55, and his failure to appeal the decision

would result in his placement on Vermont's Child Abuse and Neglect Registry.  The

letter did not assert that an investigation was opened or conducted.  On June 7, 2010,

Plaintiff appealed the substantiation to DCF's Child Abuse Registry Review Unit.

Plaintiff alleges that Defendants Zumbruski and Kellett did not follow the required

statutory procedures before substantiating him.  First, Plaintiff alleges that DCF never

opened an investigation of the abuse and that only an assessment was conducted.

Second, he alleges that Defendants failed to follow certain statutory procedures required

---

[7]  Vermont law provides that a "substantiated report" "means that the commissioner or the
commissioner's designee *has determined after investigation* that a report is based upon accurate
and reliable information that would lead a reasonable person to believe that the child has been
abused or neglected."  33 V.S.A. § 4912(10) (emphasis supplied).

for an investigation,[8] such as inspecting the scene of the alleged abuse. *See* 33 V.S.A. § 4915b(a)(1). Finally, he alleges that statutory procedures do not authorize DCF workers

---

[8] Vermont law provides:

(a) An investigation, to the extent that it is reasonable under the facts and circumstances presented by the particular allegation of child abuse, shall include all of the following:

(1) A visit to the child's place of residence or place of custody and to the location of the alleged abuse or neglect.

(2) An interview with or observation of the child reportedly having been abused or neglected. If the investigator elects to interview the child, that interview may take place without the approval of the child's parents, guardian, or custodian, provided that it takes place in the presence of a disinterested adult who may be, but shall not be limited to being, a teacher, a member of the clergy, a child care provider regulated by the department, or a nurse.

(3) Determination of the nature, extent, and cause of any abuse or neglect.

(4) Determination of the identity of the person alleged to be responsible for such abuse or neglect.

(5)(A) The identity, by name, of any other children living in the same home environment as the subject child. The investigator shall consider the physical and emotional condition of those children and may interview them, unless the child is the person who is alleged to be responsible for such abuse or neglect, in accordance with the provisions of subdivision (2) of this subsection.

(B) The identity, by name, of any other children who may be at risk if the abuse was alleged to have been committed by someone who is not a member of the subject child's household. The investigator shall consider the physical and emotional condition of those children and may interview them, unless the child is the person who is alleged to be responsible for such abuse or neglect, in accordance with the provisions of subdivision (2) of this subsection.

(6) A determination of the immediate and long-term risk to each child if that child remains in the existing home or other environment.

to encourage parents to file substantiation letters with a court prior to the accused parent's exhaustion of administrative remedies. In the absence of such authorization, Plaintiff contends the practice violates Vermont law.

In addition, although not required by statute, Plaintiff asserts that prior to substantiation, he was not provided notice of the specific allegations, given an opportunity to be heard, produce live witnesses or evidence on his behalf, examine his accusers, or allowed to present the matter to a neutral and unbiased arbiter to decide whether to substantiate the allegations. He contends that in substantiating him for child abuse, Defendants Zumbruski and Kellett "willfully ignored the family court divorce history," *id.* at ¶ 63, and other evidence which would have revealed relevant information regarding Plaintiff's relationship with his children.

Thereafter, Plaintiff alleges certain Defendants falsified additional evidence as follows:

> On June 17, 2010, in an effort to cover up the gross substantive and procedural errors associated with the false substantiations and discrimination, Defendant Kellett instructed Aaron Pelton, a DCF employee, to alter the original intake report that designated the matter for an 'assessment.' Mr. Pelton wrote "[Appended on 6/17/10 10:52 a.m. by apelton] per Ray Kellett: 'On June 3, 2010, the request for track reassignment from JPA Assessment to investigation was approved by District director Lisa Keller."

*Id.* at ¶ 57. Plaintiff alleges that, upon information and belief, Defendant Keller did not approve the reassignment but approved the alteration of the intake report and "was complicit in Defendant Kellett's attempt to cover up the fact that Mr. Wright was a victim

---

(7) Consideration of the environment and the relationship of any children therein to the person alleged to be responsible for the suspected abuse or neglect.

(8) All other data deemed pertinent.

33 V.S.A. § 4915b.

of discrimination and substantiated for child abuse without the initiation of an investigation." *Id.* at ¶ 58.

On or about June 18, 2010, Ms. Judd filed in Family Court a Verified Emergency Motion to Restrict Defendant's Parent/Child Contact and a Motion for Appointment of Guardian Ad Litem. She attached Defendant Kellett's substantiation letter to support her claim that there had been a substantial change in circumstances warranting the temporary suspension of all visits.[9] The Family Court appointed guardians ad litem for C.W. and F.W., who were allegedly informed that Plaintiff was substantiated for child abuse.

Plaintiff claims that the letter indicating Plaintiff's substantiation for child abuse remains on file with the Family Court and is accessible for public inspection. He further alleges that DCF refused his request to notify everyone who may have received notice of the substantiation, that DCF ultimately reversed it.

After the foregoing events, Plaintiff abandoned his effort to obtain medical decision-making authority over the children. Plaintiff claims that he spent approximately $6,733.36 in attorney's fees and costs on that motion and incurred an additional $7,632.45 in attorney's fees and costs in appealing DCF's substantiation. He contends that he would not have incurred these fees but for Defendants' constitutional violations.

On September 21, 2010, the independent reviewer who heard Plaintiff's appeal concluded that "the evidence d[id] not meet the current legal and policy standards for substantiation." *Id.* at ¶ 66. Plaintiff contends that the substantiation occurred "when there was no accurate or reliable information that could have caused a reasonable person to believe he abused and/or emotionally maltreated his children." *Id.* at ¶ 67.

---

[9] Under Vermont law, "[o]n motion of either parent . . . and upon a showing of real, substantial and unanticipated change of circumstances, the court may annul, vary or modify an order made under this subchapter if it is in the best interests of the child[.]" 15 V.S.A. § 668(a).

**B.    Plaintiff's Legal Claims.**

Section 1983 "allows an action at law against a 'person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" *Demoret v. Zegarelli,* 451 F.3d 140, 149 (2d Cir. 2006) (quoting 42 U.S.C. § 1983).

In his seven count Complaint, Plaintiff alleges a number of constitutional violations for which he seeks declaratory, injunctive and/or monetary relief including compensatory and punitive damages.  In Count I, he alleges a violation of procedural due process against Defendant Dale and Keller in their individual and official capacities, alleging that he had a right to be notified that the substantiation report would be released to Ms. Judd and recommended for filing with the Family Court and be heard on the matter prior to DCF's public release of the substantiation.  He contends that "[a]ll of the Defendants at all relevant times were fully aware that DCF workers routinely recommend in writing and through verbal communications that parents file substantiation letters in family courts during a case of controversy, and that this happens prior to an accused's exhaustion of administrative remedies." *Id.* at ¶ 73.  He further alleges that "Defendants Dale and Keller acted with deliberate indifference" by not enacting procedures that would prevent DCF workers from acting in the alleged manner and that as a proximate cause of their actions, he was forced to abandon his efforts to obtain medical decision-making authority and suffered "financial injury, humiliation and embarrassment, injury to his reputation, and emotional distress." *Id.* at ¶ 76.  He alleges a continuing violation because Defendant Kellett's substantiation letter remains on file with the court.

In Count II, Plaintiff alleges a violation of procedural due process against Defendant Kellett in his individual and official capacities, stating that Defendant Kellett knew that he had a duty to provide Plaintiff with notice and an opportunity to be heard before releasing the substantiation letter, that he acted with deliberate indifference in failing to perform this duty, and that he knew or should have known that the failure to

11

provide notice and opportunity to be heard would cause Plaintiff to suffer injuries. He alleges the same theory of causation and injuries as set forth in Count I.

In Count III, Plaintiff alleges procedural due process claims against Defendants Kellett and Zumbruski in their individual and official capacities, claiming they substantiated him for child abuse "when there was no reasonable basis to believe that abuse occurred." *Id.* at ¶ 84. He alleges these defendants knew or should have known the substantiation would cause him injury, and alleges the same theory of causation and injuries as in the preceding counts.

Count IV alleges a violation of procedural due process against Defendant Zumbruski in her individual and official capacities, alleging that she violated Plaintiff's "right to be free from governmental defamation by causing him to be substantiated for emotional maltreatment child abuse when she knew such to be false and no reasonable person would have found that such abuse occurred." *Id.* at ¶ 92. He alleges that his "legal status was altered because he was forced to abandon his effort to seek medical decision-making authority over the children and, instead, finance an appeal of the untrue substantiation to ensure the judgment did not become final and he was not placed on Vermont's Child Abuse Registry." *Id.* at ¶ 93. He alleges the same theory of causation and injuries as in the preceding counts.

Count V alleges a violation of equal protection against Defendants Dziobek and Keller in their individual and official capacities, contending they violated Plaintiff's right "not to be assessed or investigated for abuse based on [Plaintiff's] real or perceived race, ethnic background, national origin or racial heritage." *Id.* at ¶ 98. He contends these defendants were motivated by their false belief that he was an "Arab" to override the intake worker's recommendation and to pursue an assessment that wrongfully resulted in Plaintiff being substantiated and "publicly branded a child abuser." *Id.* at ¶ 102. Plaintiff alleges the same theory of causation and injuries as in the preceding counts. Count VI alleges a parallel violation of equal protection against Defendants Zumbruski and Keller in their individual and official capacities.

Finally, in Count VII, Plaintiff alleges a violation of due process against Defendants Yacovone, Keller, and Kellett in their official capacities, alleging that when DCF substantiates a person for child abuse and, prior to that person's exhaustion of his or her administrative remedies, causes the filing of the substantiation letter in court knowing this will afford the public access to it. He contends that when the substantiation is later reversed, "due process requires that DCF formally and specifically . . notify each person and institution it caused to be wrongly informed and expunged all internal records of the substantiation." *Id.* at ¶ 110. He alleges that "[a] public record of substantiation for child abuse is stigmatizing and can be a barrier to employment," *id.* at ¶ 110, that it is relied upon by guardians ad litem in making recommendations regarding a child's best interests. He alleges that he requested DCF to expunge the record and it not only refused to do so, but DCF has no policies and procedures in place to do so. Again, he alleges a continuing violation because the substantiation letter remains on file.

### C.    Defendants' Motion to Dismiss.

Without differentiating between individual and official capacity claims, Defendants seek a dismissal of all counts in Plaintiff's Complaint for failure to state a claim upon which relief may be granted. They contend that Plaintiff's claims fail as a matter of law because (1) Plaintiff fails to allege a violation of a constitutionally protected liberty or property interest; (2) Plaintiff received all the process that was due; (3) Plaintiff's claim that false evidence was submitted in an administrative proceedings does not allege a constitutional violation; (4) Plaintiff fails to plausibly allege any factual basis for his claim of discrimination; and (5) to the extent Plaintiff alleges a constitutional claim, Defendants are entitled to qualified immunity. Plaintiff opposes dismissal.

## II.    Conclusions of Law and Analysis.

### A.    Standard of Review.

When assessing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court assumes the complaint's "factual allegations to be true and draw[s] all reasonable inferences in the plaintiff's favor." *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009). The court's analysis is confined "to facts stated on the face of the complaint, in documents

appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991).

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal citation omitted). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

However, the court need not credit factual allegations that are speculative in nature, *see Twombly*, 550 U.S. at 555, and "legal conclusions," or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris*, 572 F.3d at 72 (quoting *Iqbal*, 556 U.S. at 678) (internal quotation marks omitted). Plaintiff's allegations that Defendants collectively held undisclosed false beliefs regarding the propensity of Arabs to abuse their children fall within the speculative and conclusory category and must be disregarded. *See Albert v. Carovano*, 851 F.2d 561, 572 (2d Cir. 1988) ("[N]aked allegation that appellees 'selectively enforc[ed] the College rules . . . against plaintiffs . . . because they are black [or] Latin' is too conclusory to survive a motion to dismiss.").

Even where a claim for relief has been stated, Defendants are entitled to qualified immunity for the claims against them in their individual capacities if their alleged conduct does not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 817-18 (1982). "A court evaluating a claim of qualified immunity 'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all[.]'" *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quoting *Conn v. Gabbert*, 526 U.S. 286, 290 (1999)). "In the event that this threshold determination reveals a possible constitutional violation, [a] qualified immunity defense is established if (a) the defendant's action did

14

not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe his action did not violate such law." *Wilkinson v. Russell*, 182 F.3d 89, 103 (2d Cir. 1999) (citation and internal quotation marks omitted). This standard ensures that "all but the plainly incompetent or those who knowingly violate the law" will be protected by qualified immunity. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

### B. Whether Plaintiff States a Claim for Violation of Procedural Due Process.

Plaintiff alleges that Defendants violated his right to due process when they deprived him of three constitutionally protected interests: (1) access to the state courts; (2) a relationship with his children; and (3) freedom from defamatory statements by state officials.

A claimed violation of procedural due process involves a two-pronged analysis. First, the court examines whether the state deprived Plaintiff of a constitutionally protected interest. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569 (1972). Second, if Plaintiff has been deprived of a constitutionally protected interest, the court determines "whether the procedures attendant upon that deprivation were constitutionally sufficient." *See Shakur v. Selsky*, 391 F.3d 106, 118 (2d Cir. 2004) (quoting *Kentucky Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989)) (internal quotation marks omitted).

### 1. Plaintiff's Allegation that he was Deprived of a Protected Interest in Access to the State Courts.

Plaintiff asserts that he was deprived of his right to access the courts because he was unable to pursue his motion for medical decision-making authority in Family Court. In essence, he argues that he was forced to abandon his motion because he could no longer afford legal counsel to pursue it as he was defending against false allegations of child abuse.

15

It is well-established that there is a constitutional right to access the courts.[10]  *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 n.5 (1982) ("[H]aving made access to the courts an entitlement or a necessity, the State may not deprive someone of that access unless the balance of state and private interests favors the government scheme.").  A state official's refusal to afford a party access to the courts, when such access "is the exclusive precondition to the adjustment of a fundamental human relationship[,]" may thus violate a party's procedural due process rights. *See Boddie v. Connecticut*, 401 U.S. 371, 383 (1971).  A claim for denial of access to the courts requires an allegation "that defendant 'took or was responsible for actions that hindered [a plaintiff's] efforts to pursue a legal claim.'" *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (quoting *Monsky v. Moraghan*, 127 F.3d 243, 247 (2d Cir. 1997)).  Here, no such allegation exists.

Plaintiff sought and received access to the state courts to adjudicate his interests related to medical decision-making authority with regard to his children.  He does not allege that the named Defendants interposed any obstacles to his access to the courts or required him to pay fees or costs of any kind.  He has also not alleged that he was prohibited from pursuing his motion as a self-represented litigant.  Accordingly, at best, he alleges that Defendants interfered with his financial ability to continue pursuing his motion with the legal counsel of his choice by allegedly providing false evidence that could be used by his opponent and by effectively forcing him to direct his efforts to appealing the child abuse substantiation.  The courts have not recognized an impairment of the right to access the courts on this basis.[11]

---

[10] The basis of this right has been found in several different sections of the Constitution. *See Christopher v. Harbury*, 536 U.S. 403, 415 n.12 (2002) (explaining that the Court has grounded decisions regarding the right to access the courts in the Privileges and Immunities Clause, the Petition Clause, the Fifth and Fourteenth Amendment Due Process Clauses, and the Equal Protection Clause).

[11] In *Lewis v. Casey*, 518 U.S. 343 (1996), the Supreme Court disclaimed certain elaborations on prisoner's access to the courts, including suggestions that "the State must enable the prisoner . . . to *litigate effectively* once in court." *Id.* at 354. Other circuits have also distinguished between difficulties continuing litigation and impediments to filing suit, concluding that the constitutional right to access the courts does not protect a litigant against the former. *See, e.g., Spitzmiller v.*

Because Plaintiff does not allege Defendants prevented his access to the courts, he fails to state a claim upon which relief may be granted. Plaintiff's due process claims, to the extent they are based upon a denial of access to the courts, are therefore DISMISSED.

**2.      Plaintiff's Allegation that he was Deprived of his Interest in a Relationship with his Children without Due Process.**

Plaintiff alleges that Defendants' actions also deprived him of his protected interest in a relationship with his children. In support of this allegation, he points out that he was forced to defend an emergency motion in Family Court seeking to suspend his visitation rights which was, in part, occasioned by Defendant Kellett's unsolicited advice to Ms. Judd that she file the substantiation letter with her motion. Plaintiff further points out that the Family Court appointed guardians ad litem for C.W. and F.W., who were allegedly informed that he had been substantiated for child abuse. Finally, he asserts that he was forced to abandon his Family Court motion for medical decision-making authority.

Defendants seek dismissal, asserting that Plaintiff fails to allege that his legal relationship with his children was actually altered by any of their alleged acts or omissions. They point out that no court has recognized a deprivation of procedural due process based on the theory espoused by Plaintiff and even if such a claim could be recognized, they would be entitled to qualified immunity with regard to it because it could not be said to be "clearly established."

The relationship between parent and child is a constitutionally protected interest. *See M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996) ("Choices about marriage, family life, and the upbringing of children are among associational rights this Court has ranked as 'of basic importance in our society,' rights sheltered by the Fourteenth Amendment against

---

*Hawkins*, 183 F.3d 912, 916 (8th Cir. 1999) (holding that plaintiff was not denied access to federal courts when he in fact filed two federal lawsuits and allegations simply stated that defendants withheld information and conducted private hearings); *Foster v. City of Lake Jackson*, 28 F.3d 425, 430 (5th Cir. 1994) (finding that the right to access the courts "encompassed a right to file an action, but not the right to proceed free of discovery abuses after filing.").

the State's unwarranted usurpation, disregard, or disrespect.") (quoting *Boddie*, 401 U.S. at 376); *see also Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999) ("Parents . . . have a constitutionally protected liberty interest in the care, custody and management of their children."); *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1997) ("Th[e] right to the preservation of family integrity encompasses the reciprocal rights of both parent and children."). However, "this interest is counterbalanced by the compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary against the parents themselves." *Russell*, 182 F.3d at 104.

The Second Circuit has recognized that child abuse investigations have the potential to interfere with this interest in violation of both procedural and substantive due process.[12]  *See Southerland v. City of New York*, 680 F.3d 127, 142 (2d Cir. 2012) (ruling that, where father sued child protective services caseworker for removal of child, "[f]irst, both the parents and the children may have a cause of action for violation of the Fourteenth Amendment under a theory of denial of procedural due process . . . Second, a parent may also bring suit under a theory of violation of his or her right to substantive due process.").[13]  Accordingly, "[a]s a general rule . . . before parents may be deprived of the care, custody, or management of their children without their consent, due process – ordinarily a court proceeding resulting in an order permitting removal – must be accorded to them." *Nicholson v. Scoppetta*, 344 F.3d 154, 171 (2d Cir. 2003) (quoting *Tenenbaum*, 193 F.3d at 593) (internal quotation marks omitted).

---

[12] Plaintiff does not allege a substantive due process violation.

[13] Defendants rely on a prior version of *Southerland* for the proposition that "even the 'brief' removal of children from the custody of their parents for several days is not a due process violation" (Doc. 3 at 14) (citing *Southerland v. City of New York*, 667 F.3d 87, 112-13 (2d Cir. 2012). After Defendants' motion was filed, the cited *Southerland* opinion was superseded by an opinion denying summary judgment in favor of a child protective services caseworker for a parent's procedural due process claim and concluding that absent a true emergency, a parent cannot be deprived of custody of his or her child without a pre-deprivation hearing. *See Southerland*, 680 F.2d at 150-51.

Plaintiff does not allege that his visitation or other rights with regard to his children were modified or diminished as a result of Defendants' substantiation and other acts or omissions. Plaintiff cites no authority, and the court has found none, to support a claim of deprivation of a constitutionally protected interest in relationship with children without "some factual allegation indicating actual interference with the custody of a child, i.e., removal." *Skalaban v. Dep't of Children & Families,* 314 F. Supp. 2d 101, 110 (D. Conn. 2004) (granting defendants' motion to dismiss when plaintiff alleged that defendants falsely accused him of abusing his son but failed to allege interference with any rights he had with respect to his son); *Daniels v. Murphy,* 2007 WL 1965303, at *4 (E.D.N.Y. July 2, 2007) (holding that "because plaintiff does not allege that a state actor 'remove[d] a child from a parent's custody,' the complaint fails to present circumstances that would trigger plaintiff's entitlement to the 'procedures that must be afforded to a parent when the coercive power of the State seeks to separate them' from their children.") (citation omitted); *Brennan v. County of Broome,* 2011 WL 2174503, at *7 (N.D.N.Y. June 2, 2011) ("Plaintiff also fails to present a viable procedural due process claim against Defendant based upon his liberty right to the custody of his son. Again, the claim fails because Defendant did not remove the child from plaintiff's custody.").

While a court should be reluctant to dismiss novel claims, this reluctance fades when the court is confronted with case law dismissing the precise claim for failure to state a claim and where qualified immunity would apply even if the claim were permitted to proceed. Accordingly, the court must DISMISS Plaintiff's procedural due process claims, to the extent they are based on a deprivation of his interest in a relationship with his children.

### 3. Plaintiff's Allegation that he was Deprived of an Interest in his Reputation.

Finally, Plaintiff claims that Defendants' actions deprived him of a constitutionally protected interest in his reputation by defaming him and imposing on him a legal duty to both defend himself against the substantiation of child abuse and respond to the motion in Family Court to suspend his visitation rights. He alleges that all of the

19

Defendants are aware that DCF workers routinely advise parents to file substantiation letters to gain an advantage in a state court custody dispute even when the accused child abuser has not exhausted his or her administrative remedies which is precisely what occurred in his case. He alleges that Defendants Zumbruski, Kellett, and Keller also fabricated evidence against him. Defendants respond that Plaintiff has not and cannot state a claim because he was not deprived of a tangible interest.

There is a constitutional right to be free from a false stigmatizing statement if it is coupled with the "deprivation of a tangible interest[.]" *Algarin v. Town of Wallkill*, 421 F.3d 137, 138 (2d Cir. 2005); *see also Paul v. Davis*, 424 U.S. 693, 708-09 (1976) (requiring both the "stigma" resulting from a defamatory statement plus an alteration in legal status in order to find deprivation of a liberty interest warranting the safeguards of procedural due process). In *Vega v. Lantz*, the Second Circuit explained:

> To establish a 'stigma plus' claim, a plaintiff must show (1) the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false, and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights. This state-imposed alteration of status or burden must be in addition to the stigmatizing statement. Thus, even where a plaintiff's allegations would be sufficient to demonstrate a government-imposed stigma, such defamation is not, absent more, a deprivation of a liberty or property interest protected by due process.

*Vega*, 596 F.3d 77, 81 (2d Cir. 2010) (internal citations and quotation marks omitted).

In his Complaint, Plaintiff alleges that he suffered a stigma when Defendants disseminated a letter to Ms. Judd that "falsely" substantiated him for child abuse and suggested that Ms. Judd file the letter in Family Court. He points out the substantiation was based on statements that Defendant Zumbruski allegedly falsely attributed to Dr. Senior, F.W.'s teacher, and C.W.'s school counselor, respectively. He further alleges that this created a public record of the false substantiation, which caused "humiliation and embarrassment, [and] injury to [Plaintiff's] reputation." (Doc. 1 at ¶ 95.)

Satisfaction of the first prong of "stigma plus" requires a "stigma, that is, in 'public opprobrium' and damage to [plaintiff's] reputation." *Valmonte v. Bane*, 18 F.3d 992, 999

(2d Cir. 1994). The stigmatizing statement must also be false. *See Balentine v. Tremblay*, 2012 WL 1999859, at *5 (D. Vt. June 4, 2012) (dismissing plaintiff's "stigma plus" claim, noting that plaintiff did not claim a false statement).

"[B]randing [a person] as a child abuser . . . certainly calls into question [his or her] 'good name, reputation, honor, or integrity.'" *Valmonte*, 18 F.3d at 1000 (quoting *Roth*, 408 U.S. at 573). Assuming the veracity of Plaintiff's allegations, that Defendant Zumbruski "manufactured false evidence" (Doc. 1 at ¶ 54) in order to justify substantiating him for child abuse, Plaintiff satisfies the first prong of the "stigma plus" test. However, Plaintiff must also allege that there was a state-imposed burden or alteration of his rights in order to satisfy the "plus" prong of the test. *See Velez v. Levy*, 401 F.3d 75, 87-88 (2d Cir. 2005) (explaining that, by itself "[a] free-standing defamatory statement . . . is not a constitutional deprivation, but is instead properly viewed as a state tort of defamation[.]") (citation and internal quotation marks omitted).

Courts have not clearly defined when a particular burden or alteration of rights fulfills the "plus" prong of the "stigma plus" doctrine. *See Neu v. Corcoran*, 869 F.2d 662, 667 (2d Cir. 1989) ("[I]t is not entirely clear what the 'plus' is."). However, some examples that meet the requirement include: deprivation of professional privileges,[14] termination of government employment,[15] removal from a community board,[16] and legally imposed burdens on obtaining private employment.[17] The Second Circuit has

---

[14] *See Greenwood v. N.Y., Office of Mental Health*, 163 F.3d 119, 124 (2d Cir. 1998) (finding "plus" prong was satisfied where plaintiff was deprived of "a property interest in clinical privileges.").

[15] *See Patterson v. City of Utica*, 370 F.3d 322, 336 (2d Cir. 2004) ("A stigma-plus claim . . . requires that a plaintiff's interest in his reputation be implicated *in connection with* his termination from government employment.").

[16] *See Velez*, 401 F.3d at 90 (finding that removal from office as a school board member based on stigmatizing statements satisfied "plus" prong of the "stigma plus" interest).

[17] *See Valmonte*, 18 F.3d at 1002 (concluding that plaintiff satisfied the "plus" prong when employers were statutorily required to justify hiring plaintiff because of her inclusion on the child abuse registry).

explained that, to satisfy the "plus" prong, "deleterious effects which flow directly from a sullied reputation would normally . . . be insufficient.  These would normally include the impact that defamation might have on job prospects, or, for that matter, romantic aspirations, friendships, self-esteem, or any other typical consequence of a bad reputation."[18]  *Valmonte*, 18 F.3d at 1001.  Instead, "the damage [to one's reputation] must be accompanied by some significant deprivation[.]"  *O'Neill v. City of Auburn*, 23 F.3d 685, 691 n.2 (2d Cir. 1994).

There is no constitutional right to be free from an erroneous child abuse substantiation.  *See Southerland*, 680 F.3d at 152 (recognizing the competing interests between the parents and the government, the court explained that "[a]n investigation [of child abuse] passes constitutional muster provided simply that case workers have a 'reasonable basis' for their findings of abuse.") (quoting *Russell*, 182 F.3d at 104); *see also Cornigans v. Mark Country Day Sch.*, 2006 WL 3950335, at *16 (E.D.N.Y. July 12, 2006) ("[W]ell-intentioned reports that are ultimately ruled unfounded are to be expected in the efforts to identify and combat child abuse.").

Moreover, in reviewing "stigma plus" claims in cases of child abuse substantiations, the majority of courts have also concluded that the "plus" element is not satisfied simply because a person is the subject of an investigation or is listed on a child abuse registry.  *See, e.g.*, *Behrens v. Regier*, 422 F.3d 1255, 1260-61 (11th Cir. 2005) (acknowledging that inclusion on the child abuse registry was stigmatizing, but affirming the district court's dismissal of plaintiff's "stigma plus" claim because state law did not recognize any right to adopt an unrelated child, which was plaintiff's alleged "plus"); *Miller v. California*, 355 F.3d 1172, 1178-79 (9th Cir. 2004) (recognizing that plaintiffs identified a triable issue of fact regarding whether being falsely listed as a suspected child

---

[18] *See, e.g.*, *Tafuto v. N.Y. State Office for Children and Family Servs.*, 2012 WL 4459803, at *7 (S.D.N.Y. Sept. 25, 2012) (concluding that allegations of day care provider that state notified parents "that their children were the subject of an indicated report . . . at best, make out a simple defamation claim."  The court went on to explain that "[w]hile [p]laintiff may have lost business as a result of these disclosures, those losses are examples of the 'deleterious effects which flow directly from a sullied reputation.") (quoting *Valmonte*, 18 F.3d at 1001).

abuser was defamatory, but denying plaintiffs' "stigma plus" claim because plaintiffs experienced no change in legal status following the listing); *Glasford v. N.Y. State Dep't of Soc. Servs.*, 787 F. Supp. 384, 387-88 (S.D.N.Y. 1992) (dismissing plaintiff's "stigma plus" claim, explaining that the "complaint . . . does not allege that plaintiff's employment prospects suffered as a result of the report in the [child abuse register.]").

Here, however, Plaintiff does not merely contend that he was erroneously substantiated for child abuse based upon a good faith investigation. To the contrary, he alleges that the investigation was not conducted in good faith, was never opened or conducted as a statutory investigation, included fabricated evidence, was motivated by ethnic discrimination, and included willfully bypassing statutory procedures and then amending DCF's records evidence to suggest otherwise. Plaintiff further asserts that the allegedly false substantiation gave rise to obstacles that he would not have otherwise faced. These include DCF's alleged interference in his Family Court proceedings on behalf of Ms. Judd by suggesting she file the substantiation letter in court,[19] when Defendants knew or should have known that Plaintiff had yet not exhausted his rights to administrative review and thus the substantiation was not final. This allegedly resulted in a state-created false public record of child abuse. Plaintiff alleges that, as the proximate result of Defendants' acts and omissions, he suffered quantifiable monetary damages in addition to the damage to his reputation.

Although a novel claim for relief, the court cannot conclude, as a matter of law, that Plaintiff has failed to identify state-imposed burdens that arguably satisfy the "plus" prong of the "stigma plus" test. *See Adato v. Kagan*, 599 F.2d 1111, 1117 (2d Cir. 1979) ("Tenuous theories of liability are better assayed in the light of actual facts than in pleader's supposition."); *see also Braden v. Univ. of Pittsburgh*, 477 F.2d 1, 4-5 (3d Cir. 1973) ("Very important constitutional questions are presented and the Supreme Court has repeatedly informed us that such difficult issues should not be decided except upon a full

---

[19] While the statute required DCF to inform Ms. Judd of the substantiation, *see* 33 V.S.A. § 4921(b), it did not require Defendants to advise her to file the substantiation letter in Family Court.

record and after adequate hearing."). Accordingly, this portion of Plaintiff's claim survives Defendants' motion to dismiss. Concluding that Plaintiff has adequately alleged that he was deprived of constitutionally protected interest in his reputation, the court next determines whether Plaintiff adequately alleges that Defendants failed to employ due process in the alleged deprivation of that interest. *See Shakur*, 391 F.3d at 118.

### 4.    Plaintiff's Allegations of a Denial of Due Process.

As Defendants correctly point out, Plaintiff concedes that he was contacted by Defendant Zumbruski prior to the substantiation and was provided with some notice of the subject matter of the allegations albeit without specific details. DCF interviewed various individuals, including C.W. and F.W., prior to the substantiation. Plaintiff also admits that DCF sent him a letter advising him of the substantiation and the basis for it, and also notified him of his right to appeal, and the consequences of a failure to appeal. Finally, Plaintiff concedes that he successfully appealed the substantiation, and "the independent reviewer . . . concluded that 'the evidence [did] not meet the current legal and policy standards for substantiation.'" (Doc. 1 at ¶ 66.) Defendants contend that this is all the process Plaintiff was due. Plaintiff disagrees and claims that, at a minimum, Defendants should be required to follow their own procedures before it created a public and allegedly false record of child abuse substantiation. Here, the only issue is the adequacy of Plaintiff's pleading.

The Supreme Court has held that simple negligence is insufficient to support a due process claim. *Daniels v. Williams*, 474 U.S. 327, 328 (1986) (holding "[t]he Due Process Clause is not implicated by a state official's negligent act causing unintended loss of or injury to life, liberty or property."). "The circuit courts have responded accordingly in requiring a state of mind element such as recklessness or gross negligence." *Brown v. Montoya*, 662 F.3d 1152, 1170 (10th Cir. 2011) (citing *Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 196 (3d Cir. 2009) (requiring that, for a procedural due process claim, a plaintiff "at a minimum, prove recklessness or gross negligence") (quotation omitted); *Howard v. Grinage*, 82 F.3d 1343, 1350 (6th Cir. 1996) (requiring "conduct undertaken with something more than negligence")).

In his Complaint, Plaintiff alleges that Defendants Zumbruski, Kellett, and Keller each had personal involvement in the alleged due process violation,[20] and that they acted willfully and intentionally in an effort to discriminate against Defendant based upon his perceived status as an "Arab." For purposes of pleading, Plaintiff has thus alleged a state of mind beyond simple negligence.

As Defendants point out, regardless of their alleged state of mind, Plaintiff cannot base a claim of violation of due process solely on allegations that state actors failed to follow state law or procedures. *See Holcomb v. Lykens*, 337 F.3d 217, 225 (2d Cir. 2003) ("The defendants may have breached Vermont law or their own procedures, and their conduct may have been deplorable for that reason, but it did not violate the Fourteenth Amendment."); *Robison v. Via*, 821 F.2d 913, 922 (2d Cir. 1987) (explaining that "a violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim," because, "[f]ederal constitutional standards rather than state statutes define the requirements of procedural due process"); *Pollnow v. Glennon*, 757 F.2d 496, 501 (2d Cir. 1985) ("[I]t is unnecessary for us to determine whether appellees violated any applicable state law. Clearly, a violation of state law is not cognizable under § 1983."). Defendants are incorrect, however, in their further assertion that compliance with applicable statutory procedures is "irrelevant." *See* Doc. 3 at 20 ("Plaintiff's various allegations suggesting that the investigation did not comport with state procedures are irrelevant to his due process claims."). The Second Circuit has held that "[o]ur precedent indicates that a failure to abide by established procedures or standards evince an improper objective." *Shakur v. Selsky*, 391 F.3d 106, 116 (2d Cir. 2004); *see also Kuck v. Danaher*, 2012 WL 4904387, at *30 (D. Conn. Oct. 16, 2012) ("[T]his court has found that Plaintiffs have plausibly stated a due process violation . . . [and] that a failure to follow statutory procedures can rise to the level of a due process violation.").

---

[20] *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") (citation omitted).

If Plaintiff's allegations are accepted as true, Plaintiff was arguably "substantiated" for child abuse based upon an "assessment" in violation of Vermont law. While not dispositive, such noncompliance with applicable statutory procedures is clearly relevant to whether he was afforded procedural due process. The constitutional deprivation Plaintiff alleges is based upon Defendants' pre-substantiation acts and omissions and the publication of the substantiation before he had exhausted his administrative remedies.

"[T]he fundamental requisite of due process of law is the opportunity to be heard. This right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (internal citations and quotation marks omitted). The opportunity to be heard must thus occur "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Moreover, 'procedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases." *Id.* at 344. "In other words, the requirement of a hearing or other procedural safeguard typically will not depend on the quantum of evidence possessed by the government in any one particular case." *Kia P. v. McIntyre*, 235 F.3d 749, 759 (2d Cir. 2000).

Courts must balance a number of facts in determining whether due process has been afforded:

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335.

"Under *Mathews* the cases inevitably turn on their particular facts[.]" *McKithen v. Brown*, 481 F.3d 89, 107 (2d Cir. 2007); *see also Ciambriello v. Cnty. of Nassau*, 292

F.3d 307, 319 (2d Cir. 2002) ("The determination of whether one is entitled to a pre-deprivation hearing is fact-specific, as 'due process is flexible and calls for such procedural protections as the particular situation demands.'") (quoting *Mathews*, 424 at 334).

In this case, the facts are not established, nor do the parties agree as to the pre-deprivation process that was afforded to Plaintiff. Instead, the court is faced with allegations that Defendant Zumbruski allegedly fabricated evidence in support of the substantiation while motivated by a discriminatory belief that she was investigating an "Arab" and that "cultural factors" were contributing to the alleged abuse. Plaintiff further alleges that Defendant Kellett advised Ms. Judd to use the substantiation against Plaintiff, knowing that it was neither final nor the product of an "investigation." Finally, Plaintiff alleges that Defendant Kellett and Keller participated in an alteration of DCF's records to cover up these facts. Accepting these allegations as true, the court cannot determine, as a matter of law, that due process was afforded Plaintiff prior to the deprivation he claims as the basis for his stigma-plus claim.

Where the facts material to the determination of a due process claim have not been established, a court may deny a motion to dismiss until the factual record is developed. *See Kuck v. Danaher*, 600 F.3d 159, 167 (2d Cir. 2010) (noting that pleadings did not establish that due process was afforded, concluding that a procedural due process claim had been stated, and observing that "[w]hether discovery will bear out [t]his claim is a matter for the district court to determine on remand.").

The court thus DENIES Defendants' motion to dismiss Plaintiff's stigma-plus procedural due process claims against them for failure to state a claim. However, even if Defendants violated Plaintiff's constitutionally protected right to due process, Plaintiff's claims must be dismissed if Defendants are entitled to qualified immunity because that right was not clearly established.

### C.    Whether Plaintiff's Due Process Claim was Clearly Established.

Qualified immunity protects government officials from lawsuits over errors made while reasonably performing their duties, whether resulting from "a mistake of law, a

mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)). The privilege is "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). As a result, the Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

To determine whether a right is clearly established, the court will look to "(1) whether the right was defined with reasonable specificity; (2) whether Supreme Court or court of appeals case law supports the existence of the right in question, and (3) whether under preexisting law a reasonable defendant would have understood that his or her acts were unlawful." *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010). The standard does not mean that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful[.]" *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Instead, the question is whether pre-existing law from this and other circuits provides officers with "fair warning" that the conduct in question is unlawful. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (examining "whether the state of the law [at the time] gave respondents fair warning that their alleged treatment of [plaintiff] was unconstitutional"); *see also Scott*, 616 F.3d at 105 (explaining that courts may rely on precedent from other circuit courts of appeals in deciding whether a right is clearly established).

Defendants contend that they are entitled to qualified immunity with respect to Plaintiff's due process claims because the reputational interest which he alleges amounts to a new extension of the law. Plaintiff responds that his right to be free from a "stigma plus" deprivation of his rights was clearly established. He further argues that Defendants Zumbruski, Kellett, and Keller in particular, should not be entitled to qualified immunity because they falsified and fabricated evidence.

"[Q]ualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Hope*, 536 U.S. at 739. In situations

28

where "[t]he state of the law was at best undeveloped at the relevant time . . . officers cannot have been expected to predict the future course of constitutional law." *Wilson v. Layne*, 526 U.S. 603, 605 (1999). While the Second Circuit has "applied the 'stigma plus' test many times," *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 50 (2d Cir. 2001), *rev'd on other grounds, Conn. Dep't of Public Safety v. Doe*, 538 U.S. 1 (2003), it has stated that "it is not entirely clear what the plus is." *Neu*, 869 F.2d at 667. "[The Second Circuit] often elide[s] the issue of whether the defendant had deprived the plaintiff of a [stigma plus] interest, concluding that the defendant was in any event entitled to prevail on grounds of qualified immunity because any such interest was not clearly established at the time of the alleged violation." *Doe v. Dep't of Pub. Safety*, 271 F.3d at 50.

Plaintiff cites no precedent that the "plus" prong of the "stigma plus" analysis may be satisfied in the manner he proposes in this case. Because of this lack of precedent, the court cannot conclude that the right was clearly established at the time that Defendants substantiated Plaintiff for child abuse. Accordingly, the court GRANTS Defendants' motion to dismiss Plaintiff's stigma-plus procedural due process claims against Defendants Dale and John Does in their individual capacities. Plaintiff's claims against Defendants Zumbruski, Kellett, and Keller, however, require additional scrutiny.

If, as Plaintiff alleges, Defendant Zumbruski, Kellett, and Keller fabricated evidence in support of the substantiation, it would not have been objectively reasonable for them to believe the substantiation of Plaintiff for child abuse based on such evidence was lawful. In cases where there is a plausible claim of state-fabricated material evidence, the finder of fact must first determine whether the alleged fabrication occurred before the court can determine whether qualified immunity is available. *See Southerland*, 630 F.3d at 146 ("[W]e do not . . . agree with the district court's conclusion that no reasonable juror could find that [the child protective services caseworker] did not knowingly or recklessly make false statements—the immunity inquiry. We think that several disputed facts, taken together and viewed in the light most favorable to the plaintiffs, would permit a reasonable factfinder to find otherwise."). Indeed, in a parallel

context, the Second Circuit has repeatedly held that qualified immunity is not available where the constitutional deprivation at issue is alleged to have occurred "as a result of the fabrication of evidence by a government officer acting in an investigation capacity[.]" *Zahrey v. Coffey*, 221 F.3d 342, 342 (2d Cir. 2000); *Scotto v. Almenas*, 143 F.3d 105, 113 (2d Cir. 1998) ("On the present record, Almenas cannot establish his entitlement to qualified immunity as a matter of law.  Scotto alleges that Almenas fabricated a parole violation and arrested him knowing he lacked probable cause to do so.  Such conduct, if proved, would plainly violate Scotto's clearly established right to be free from arrest in the absence of probable cause."); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997) (reversing grant of summary judgment because "plaintiffs' evidence could support view" that defendants cooperated in an unlawful arrest and then "falsif[ied] the circumstances, although they knew there was no probable cause to justify the arrest."); *see also Sakoc v. Carlson*, 2012 WL 3929904, at *13 (D. Vt. Sept. 10, 2012) (denying motion to dismiss based on qualified immunity because the material facts were in dispute, including whether evidence in support of probable cause was fabricated which would render it unreasonable for law enforcement officer to believe that an arrest based upon such evidence was lawful).

For the foregoing reasons, the court DENIES Defendants' motion to dismiss Plaintiff's stigma-plus procedural due process claims against Defendants Zumbruski, Keller and Kellett.

### D.     Whether Plaintiff has Adequately Alleged Equal Protection Claims Against Defendants.

In Counts V and VI of the Complaint, Plaintiff alleges Defendants Zumbruski, Dziobek, Kellett, and Keller violated his right to equal protection, claiming that each made decisions while investigating and substantiating him for child abuse based on his or her mistaken belief that he was an "Arab." He alleges that the laws related to the assessment, investigation, and substantiation of reports of child abuse were facially neutral, but his rights were infringed because these laws were applied in a discriminatory manner based upon perceived ethnicity.

30

In support of his equal protection claim, Plaintiff makes several factual assertions, including: (1) the intake form stated that Plaintiff was an "Arab;" (2) only Plaintiff's perceived ethnicity is indicated on the form, although other individuals are mentioned; (3) the form lists "cultural factors" as a "contributing factor" to the alleged abuse (Doc. 1 at ¶ 32); and (4) Defendant Zumbruski falsely attributed an allegedly racist statement to Dr. Senior, that Plaintiff "is a boy" and "is unbelievable." *Id.* at ¶ 43.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886) ("Though the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the [C]onstitution."). In equal protection cases, the plaintiff must establish that the conduct "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Wayte v. United States*, 470 U.S. 598, 608 (1985).

"When pleading a violation of the Equal Protection Clause, it is sometimes necessary to allege the existence of a similarly situated group that was treated differently." *Brown v. City of Oneonta, N.Y.*, 221 F.3d 329, 337 (2d Cir. 2000). However, the Second Circuit has clarified that, "[a] plaintiff alleging an equal protection claim under a theory of discriminatory application of the law . . . generally need not plead or show the disparate treatment of other similarly situated individuals." *Pyke v. Cuomo*, 258 F.3d 107, 108-09 (2d Cir. 2001); *see also Winfield v. Trottier*, 2011 WL 4442933, at *16 (D. Vt. Sept. 21, 2011) ("*Pyke* 'dispenses with the need to [show] that a similarly situated group was treated differently because,' whenever 'racially discriminatory intent infects the application of a neutral law or policy, . . . adverse [discriminatory] effects can be presumed.'") (quoting *Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 543

31

(S.D.N.Y. 2006)); *Coward v. Town and Vill. of Harrison*, 665 F. Supp. 2d 281, 303 (S.D.N.Y. 2009) (finding plaintiff alleged a prima facie equal protection violation when he was arrested for harassment, which he asserted did not occur, and he was "the only African-American in the [p]ark at the time of his arrest").

In this case, the court's inquiry is further complicated by the fact that it is not clear from Plaintiff's Complaint whether Plaintiff in fact belongs to a protected class as an "adult ethnic [man] of color" (Doc. 1 at ¶ 43), but does not possess Arab ethnicity, or whether he does not belong to any protected class and thus bases his equal protection claim solely upon the Defendants' erroneous assumption that he does. In either case, Plaintiff does not allege that he was discriminated against based on his *actual* race and ethnicity, but on what Defendants *perceived* as his Arab ethnicity.

Some courts have recognized that intentional discrimination based on a misperception that a plaintiff belongs to a protected class of persons can form the basis of an equal protection violation. *See Stemler v. City of Florence*, 126 F.3d 856, 874 (6th Cir. 1997) (reversing dismissal of plaintiff's claims, finding that plaintiff had alleged that "the defendants violated the core principle of the Equal Protection Clause by choosing to exercise the power of the state against [plaintiff] solely for the reason that they disapproved of her *perceived* sexual orientation") (emphasis supplied); *Major Tours, Inc. v. Colorel*, 799 F. Supp. 2d 376, 392-93 (D.N.J. 2011) (explaining that an equal protection violation can be found if "a reasonable factfinder could infer that the State Defendants knew, *or operated on their beliefs about*, the race of the remaining four bus company owners") (emphasis supplied); *Diaz-Bernal v. Myers*, 758 F. Supp. 2d 106, 134 (D. Conn. 2010) (finding allegations that "defendant officers targeted a primarily Latino neighborhood, arrested people who *appeared* Latino, [and] detained one plaintiff solely because he spoke Spanish and *appeared* Latino" were sufficient for an equal protection claim) (emphasis supplied). At least one court, however, has concluded that there can be no constitutional claim based solely upon a *perceived* membership in a protected class. *See Longmire v. City of Oakland*, 2010 WL 4510854, at *6 (N.D. Cal. Nov. 2, 2010) ("[T]hough there may be sufficient factual allegations to assert a discrimination claim

32

under Title VII based on the perception of [p]laintiff as a member of a certain religion, neither [p]laintiff nor the [c]ourt have found any authority to support the claim under a constitutional rubric. . . . [T]here is no authority for the perception theory of liability in the constitutional arena.").

Plaintiff bears the burden of proving intentional discrimination;[21] however, at this juncture, he has sufficiently alleged that Defendants engaged in intentional discrimination by treating him differently in applying facially neutral laws because of their mistaken belief that he was an "Arab." *Pyke*, 258 F.3d at 110 (recognizing equal protection claim where "facially neutral law or policy has been applied in an intentionally discriminatory race-based manner[.]"); *see also Aikman v. Cnty. of Westchester*, 491 F. Supp. 2d 374, 377, 383 (S.D.N.Y. 2007) (finding allegations that officers conducted surveillance on plaintiff prior to traffic stop, used a broken side-view mirror as a pretext to pull plaintiff over, and stopped plaintiff because he was African-American, were sufficient to survive a motion to dismiss).[22] Although neither the United States Supreme Court nor the Second Circuit have recognized an equal protection violation based upon perceived ethnicity, at this nascent stage in the proceedings, the claim is sufficiently plausible to survive a motion to dismiss. *See Adato*, 599 F.2d at 1117; *see also Elec. Constr. & Maint. Co. v. Maeda Pac. Corp.*, 764 F.2d 619, 623 (9th Cir. 1985) ("The court should be especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability is novel or extreme, since it is important that new legal theories be explored and assayed in

---

[21] *See Pyke*, 258 F.3d at 110 ("Plaintiffs will, of course, be required to substantiate their claim that the [decision] was motived by racial discrimination."); *Howard v. Senkowski*, 986 F.2d 24, 25 (2d Cir. 1993) ("The claimant always has to prove discriminatory motivation.").

[22] Courts in the Second Circuit have also denied motions to dismiss and motions for summary judgment for equal protection claims wherein a plaintiff alleges that the defendant used racial or ethnic epithets toward the plaintiff. *See, e.g., Snoussi v. Bivona*, 2010 WL 3924683, at *5 (E.D.N.Y. Sept. 29, 2010) (finding plaintiff's allegations that defendants "called him a 'fucking Arab,' a 'fucking terrorist,' and other 'derogatory comments aimed at his religious, ethnic and racial background' [were] sufficient to state a claim of intentional discrimination."); *Vilkhu v. City of New York*, 2008 WL 1991099, at *5 (E.D.N.Y. May 5, 2008) ("[A] reasonable juror could find that the use of racial epithets supports the determination that the defendants violated plaintiff's right to equal protection.").

33

the light of actual facts rather than a pleader's suppositions.") (quoting 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 1969)) (internal quotation marks omitted); *Sherman v. St. Barnabas Hosp.*, 535 F. Supp. 564, 571 (S.D.N.Y. 1982) (acknowledging that no successful claim had previously been made, the court found that in a "developing area of the law it would be imprudent at the pleading stage to dismiss categorically the possibility.").

Defendants contend that even if Plaintiff does adequately allege an equal protection violation, they are entitled to qualified immunity because they did not violate a clearly established right.

### E.     Whether Plaintiff's Right to be Free from Discrimination Based on Perceived Ethnicity was Clearly Established.

There is scant authority addressing whether discrimination against an individual based on a misperception that the individual belongs to a suspect class violates the Equal Protection Clause. Defendants are entitled to qualified immunity if Plaintiff's right to be free from such discrimination was not clearly established at the time of the violation. *See Tracy v. Freshwater*, 623 F.3d 90, 99 n.5 (2d Cir. 2010). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Ordinarily, the lack of controlling precedent and a split in authority would alone dictate a finding that the right is not clearly established. *See Morgan v. Swanson*, 659 F.3d 359, 372 (5th Cir. 2011) ("Where no controlling authority specifically prohibits a defendant's conduct, and when the federal circuit courts are split on the issue, the law cannot be said to be clearly established.") (citing *Wilson v. Layne*, 526 U.S. 603, 617-18 (1999)).

However, in this case, the determination is rendered more complex by two factors. First, Plaintiff may in fact belong to a protected class – just not the one that Defendants allegedly intended to discriminate against. In that circumstance, Plaintiff's right to be free from intentional racial or ethnic discrimination would be clearly established. *See Patterson v. Balsamico*, 440 F.3d 104, 115 (2d Cir. 2006) (finding equal protection claim arising from race-based discrimination "involved 'clearly established statutory or

34

constitutional rights of which a reasonable person would have known.'") (quoting *Harlow*, 457 U.S. at 818).

A much closer and more nuanced question is whether a defendant violates a clearly established right when he or she is alleged to have *intended* to engage in prohibited ethnic discrimination, but is simply mistaken in the belief that the intended recipient of that discrimination belongs to a protected class. In such instances, the intentional discrimination is clearly directed towards violating a clearly established right but it misses its target because the recipient is not part of a protected class. It would be objectively unreasonable for Defendants Zumbruski, Dziobek, Kellett, and Keller to believe they could discriminate against Plaintiff because of his perceived ethnicity in substantiating him for child abuse, regardless of the accuracy of their perceptions. *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("[T]he Constitution prohibits selective enforcement of the law based on considerations such as race."); *Elliot-Park v. Manglona*, 592 F.3d 1003, 1006-07 (9th Cir. 2010) (affirming district court's denial of motion to dismiss § 1983 claims against law enforcement officers who allegedly discriminated based on victim's race, explaining that "[t]he right to non-discriminatory administration of protective services is clearly established."); *Vakilian v. Shaw*, 335 F.3d 509, 521 (6th Cir. 2003) ("Although investigators have considerable discretion as to how they conduct investigations and enforce the law, a reasonable officer . . . would have recognized that selective enforcement on the basis of a suspect's race or ethnicity is unconstitutional.").

Defendants address their claim for qualified immunity for Plaintiff's equal protection claims in a single statement. *See* Doc. 3 at 27 ("At the least, the Defendants are entitled to qualified immunity."). Plaintiff's response is only slightly less succinct. *See* Doc. 14 at 13 ("No reasonable official could have believed it was lawful to accept the report for an assessment or substantiate Mr. Wright for child abuse based on beliefs that he was an 'Arab' and that 'Arabs' are more prone to abuse children."). This issue requires a more comprehensive examination by both parties. In the absence of adequate

briefing, the court declines to address the issue on a motion to dismiss.[23]  Accordingly, the court DENIES Defendants' motion to dismiss Plaintiff's equal protection claims.

## CONCLUSION

For the reasons stated above, the court GRANTS Defendants' motion to dismiss the claims against Defendants, whether in their individual or official capacities, based upon alleged interference in Plaintiff's access to the courts and in his relationship with his children, for failure to state a claim.  The court further GRANTS Defendants' motion to dismiss the stigma-plus procedural due process claim against Defendants Dale and John Does in their individual capacities based upon qualified immunity.  The court denies all other remaining aspects of Defendants' motion to dismiss (Doc. 3).

SO ORDERED.

Dated at Rutland, in the District of Vermont, this _2nd_ day of November, 2012.

Christina Reiss, Chief Judge
United States District Court

---

[23] *See Jimmo v. Sebelius*, 2011 WL 5104355, at *22 n.13 (D. Vt. Oct. 25, 2011) (declining to address grounds for dismissal that were only cursorily addressed in the briefing); *Ibarra v. City of Chicago*, 2011 WL 4583785, at *8 (N.D. Ill. Sept. 28, 2011) ("Given the complexity of the legal issues, the parties' cursory treatment of the issues, and the current stage of the litigation, the Court declines to dismiss Count II at this time."); *Allstate Ins. Co. v. Heil*, 2007 WL 4270355, at *2 n.2 (D. Haw. Dec. 6, 2007) ("Because the parties have not briefed the Rule 702 issue in anything more than a cursory way as part of their summary judgment arguments, the court declines to resolve the expert admissibility issues on the record before it.").