U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2014 MAR 21  PM 3:41

CLERK
BY _____
        DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| PAUL WRIGHT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 5:12-cv-27 |
| ) | |
| DAVE YACOVONE, STEVE DALE, ) | |
| LISA KELLER, RAYMOND KELLETT, ) | |
| KELLI ZUMBRUSKI, GYLA DZIOBEK, ) | |
| and JOHN DOES, ) | |
| ) | |
| Defendants. ) | |

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
(Doc. 39)

Plaintiff Paul Wright brought this civil rights action pursuant to 42 U.S.C. § 1983 against Defendants Dave Yacovone, Steve Dale, Lisa Keller, Raymond Kellett, Kelli Zumbruski,[1] Gyla Dziobek and John Does. Plaintiff alleges Defendants violated his constitutional rights when they substantiated him for child abuse and released a letter informing his ex-wife of the substantiation with a recommendation that she file the letter in Vermont Family Court.

Presently before the court is Defendants' motion for summary judgment. (Doc. 39.) On February 4, 2014, the court held oral argument in this matter and subsequently granted Plaintiff's voluntary dismissal of his equal protection claim as to all Defendants and his procedural due process claim as to Defendants Yacovone, Dale, Keller, Dziobek,

---

[1] Since the filing of this case, Defendant Zumbruski's last name changed to Kilanski. Because the parties refer to her as Zumbruski, and because that was her name during the events that precipitated this suit, this Order will refer to her as Defendant Zumbruski.

and Does. As a result, only Plaintiff's procedural due process claim against Defendants Kellett and Zumbruski remains.[2]

Plaintiff is represented by Brian R. Marsicovetere, Esq. Defendants are represented by Vermont Assistant Attorney General David R. Groff.

I.      **Factual Background.**

   A.      **Undisputed Facts.**

Plaintiff is a resident of Brattleboro, Vermont. On February 11, 2005, Plaintiff and his former wife, Sandra Judd, divorced. They have two minor children, C.W. and F.W.

At all relevant times, Defendant Dale was Commissioner of the Vermont Department of Children and Families ("DCF"); Defendant Keller was Director of DCF's Brattleboro field office; Defendant Kellett was a DCF "Casework Supervisor" in the Brattleboro field office; Defendant Zumbruski was a DCF caseworker in the Brattleboro field office; and Defendant Dziobek was a Supervisor in DCF's Central Intake Office. Defendant Yacovone is the current Commissioner of DCF.

In the course of Plaintiff's divorce, he stipulated that Ms. Judd should be granted sole legal and physical parental rights and responsibilities of C.W. and F.W. Pursuant to this same stipulation, Plaintiff was granted full access to the children's medical, dental, law enforcement, and school records, and substantial visitation rights.

In 2008, Ms. Judd sought to move to Oregon with the children. In response, Plaintiff filed a motion seeking full physical and legal custody on the basis that the move would undermine his visitation rights. Ms. Judd opposed the motion. At the custody hearing, the children's classroom and extracurricular teachers and numerous other individuals testified that the children were "well adjusted, doing fine in school, and had a loving relationship with [Plaintiff]." (Doc. 46-2 ¶ 3.) At no point did anybody, including Ms. Judd, allege that the children were abused. The Family Court judge determined that Ms. Judd could not move with the children to Oregon.

---

[2] Plaintiff sues Defendants Kellett and Zumbruski in both their individual capacities for monetary damages and in their official capacities for injunctive and declaratory relief.

2

In 2009, Plaintiff learned that C.W. was seeing a psychiatrist, Dr. Neil Senior, who had prescribed him "Vyvance." After consulting with C.W.'s primary care physician, Plaintiff became concerned about the drug's side effects, the quality of C.W.'s mental health treatment, his diagnoses, and whether medication was the best course of treatment. Thereafter, at the direction of Ms. Judd, the children's physicians and counselors ceased communicating with Plaintiff and denied him access to the children's medical records. In response, Plaintiff filed a verified motion to modify parental rights and responsibilities in the Windham County Superior Court's Family Court Division, requesting medical decision-making authority with regard to the children. In the motion, Plaintiff raised various concerns about the side effects of the medication that C.W. was experiencing.

In Ms. Judd's opposition to Plaintiff's motion, she alleged that Plaintiff mistreated the children during visits, noting that the children reported being "physically restrained at times by their father and in one instance . . . of being smothered and of having difficulty breathing." *Id.* ¶ 7 (internal quotation marks omitted). This was the first time Plaintiff had been accused of mistreating the children. Ms. Judd advised the Family Court that the allegations were not previously brought forth because she feared Plaintiff's retribution against the children.

Following Ms. Judd's allegations of abuse, on April 22, 2010, a mental health care provider, Ms. Ingrid Longo, reported to DCF that Plaintiff was "very controlling and abusive to the kids," was "opposed to the kids taking medicine," and that on several occasions laid on top of F.W. "to restrain [him], to the point that [he] becomes terrified that he can't breathe and screams." (Doc. 39-1 ¶ 5) (internal quotation marks omitted). According to Ms. Longo, F.W. became aggressive at school and had nightmares following these incidents. Ms. Longo also reported a number of other claims regarding Plaintiff's alleged abuse, including accusations that Plaintiff neglected the children and that the children were afraid of him.[3] Ms. Longo also stated that Plaintiff is an "Arab." Plaintiff was born and raised in the United States and has no Arab ancestry.

---

[3] Ms. Longo's report included claims that:

3

In response to Ms. Longo's report, DCF conducted an intake used to determine what level of field response, if any, was necessary. Consistent with DCF's rules and practices, the intake worker recorded the information reported and did not determine whether it constituted a report of abuse or neglect, as defined in rules or statutes. The intake report includes Ms. Longo's assertion that Plaintiff is an Arab and also lists "cultural factors" as a "contributing factor" to the alleged abuse. (Doc. 39-2 at 2, 3.) DCF's intake worker recommended that Ms. Longo's allegations not be accepted for assessment or investigation.

Pursuant to DCF's customary procedures, the central intake supervisor, Defendant Dziobek, reviewed the intake report. Defendant Dziobek concluded that an assessment was warranted because "the parent's behavior overall may pose risk to [the] children" even though there was no specific incident that placed the children at "significant risk." (Doc. 39-2 at 4.) In reaching this decision, Defendant Dziobek gave no consideration to the assertion of the reporter that Plaintiff was an Arab. The intake report was assigned to Defendant Zumbruski for assessment.

During the ensuing weeks, Defendant Zumbruski contacted and interviewed numerous witnesses, including Ms. Judd, one of the children's therapists, school personnel, Dr. Senior, F.W.'s teacher, C.W.'s school counselor, and both of the boys. When interviewed, Ms. Judd reported many of the allegations of abuse documented in the Longo report.[4] Ms. Judd also stated that she could not afford an attorney to alter the

---

    during visits with Plaintiff a child developed cracked lips and sores on his lips, and lost weight; that the boy's physician had noted a drop off in growth; that one child gets agitated and impulsive after visits with Dad; that Plaintiff did not supervise the boys in public, resulting in one becoming lost; that Plaintiff would not take one child to the hospital after he broke his toe; that the children reported to their mother that they were afraid of Plaintiff; and that both children told their mother that Plaintiff had stated that he would rather pay for their funerals than for child support.

(Doc. 39-1 at ¶ 5) (internal quotation marks omitted).

[4] Ms. Judd's allegations included:

    the alleged manner of Plaintiff's restrain[t] of [his] children; Plaintiff's reported statement preferring to pay for the boys' funerals instead of child support; that at

4

custody order. Ms. Judd had been represented by counsel in prior contested hearings in Family Court. C.W.'s school counselor advised DCF that C.W. said he hated Plaintiff and did not want to go to his house. The counselor stated that she told C.W. to discuss these issues with his mental health provider, and sought a release to speak with the provider herself. The counselor thought that the problems could adversely impact C.W.'s ability to perform in school. A staff person at F.W.'s school reported that she was glad DCF was involved with the boys, that she had concerns about one of the boys emotionally, and that the boys and their mother had complained about Plaintiff's caretaking. A therapist for one of the boys stated that Plaintiff refused to provide medical treatment for one boy, mocked the boys, and was abusive. Dr. Senior stated that Plaintiff "is a boy. He is unbelievable." (Doc. 39-1 ¶ 24) (internal quotation marks omitted). Defendant Zumbruski attempted to contact the children's pediatrician but did not speak with him. Finally, Defendant Zumbruski interviewed both boys separately, who each repeated some of the allegations included in the intake report, including that Plaintiff neglected them and was physically abusive.

    Defendant Zumbruski contacted Plaintiff to notify him of the assessment into the allegations of abuse. Plaintiff denied the report and claimed it was motivated by Ms. Judd's attempt to influence the Family Court proceedings. Plaintiff referred Defendant Zumbruski to those proceedings for additional background information and stated that he would need to obtain legal advice. Defendant Zumbruski also advised Plaintiff's family law attorney that an assessment was being conducted. Plaintiff was never contacted again by Defendant Zumbruski, and she did not request to visit Plaintiff's home for an inspection. Aside from obtaining the custody order and docket entry of Plaintiff's Family

---

        least one boy said he did not want to return to Plaintiff's house; that Plaintiff was
        verbally abusive to the boys; that the boys behave differently, including
        aggressive behavior, after visits with [Plaintiff]; and that Plaintiff pays no
        attention to boys in public and loses them often.
(Doc. 39-1 ¶ 17.)

5

Court case, Defendant Zumbruski did not examine any of the family court history as part of her assessment.

Meanwhile, Ms. Judd contacted Defendant Kellett to inquire into the status of Plaintiff's visitation rights given the concerns raised in Ms. Longo's report. Defendant Kellett stated that Ms. Judd was required to comply with the Family Court Order.

On June 4, 2010, Defendant Zumbruski recommended that Plaintiff be substantiated for emotional maltreatment of C.W. and F.W. That same day, Defendant Kellett substantiated Plaintiff for child abuse and Defendants Kellett and Zumbruski closed the case without further action. Plaintiff was classified as a level one offender, the most severe child protection level. Under Vermont law, "substantiation" may occur only after an "investigation." *See* 33 V.S.A. § 4912(10) (defining a "substantiated report" as a determination reached after an "investigation"). The conversion of the matter from an assessment to an investigation was not documented as of June 4, 2010.

On June 4, 2010, Defendants Zumbruski and Kellett sent letters to Ms. Judd and Plaintiff. In the letter to Ms. Judd, they stated: "In April of 2010, [DCF] received a report of concern that caused us to open an assessment into the safety of your children [C.W.] and [F.W.]. **Based on the information we gathered, we have determined that a reasonable person would conclude that this abuse did occur.**" (Doc. 46-2 ¶ 20). (internal quotation marks omitted). In light of Ms. Judd's prior inquiry into visitation and custody issues, Defendant Kellett placed a handwritten note on the bottom of the letter to Ms. Judd stating: "Please submit this to Family Court if you want to modify the visitation order." *Id.* ¶ 22 (internal quotation marks omitted).

In the June 4, 2010 letter to Plaintiff, Defendants Zumbruski and Kellett advised Plaintiff that he had been substantiated for child abuse and that his failure to appeal the decision would result in his placement on Vermont's Child Abuse and Neglect Registry (the "Registry"). On June 7, 2010, Plaintiff appealed the substantiation to DCF's Child Abuse Registry Review Unit. On June 17, 2010, Defendant Kellett instructed Aaron Pelton, a DCF employee, to amend the original intake report that designated the matter for an "assessment." Mr. Pelton wrote "[Appended on 6/17/10 10:52 a.m. by apelton] per

6

Ray Kellett: On June 3, 2010, the request for track reassignment from JPA Assessment to investigation was approved by District director Lisa Keller." *Id.* ¶ 26 (internal quotation marks omitted).

On June 18, 2010, Ms. Judd filed in Family Court a Verified Emergency Motion to Restrict Defendant's Parent/Child Contact and a Motion for Appointment of Guardian Ad Litem. She attached the substantiation letter to support her claim that there had been a substantial change in circumstances warranting the temporary suspension of all visits. The letter indicating Plaintiff's substantiation for child abuse remains on file with the Family Court and is accessible for public inspection.

On September 21, 2010, the independent reviewer who heard Plaintiff's appeal concluded that "the evidence d[id] not meet the current legal and policy standards for substantiation." *Id.* ¶ 32 (internal quotation marks omitted). Following this finding, DCF refused Plaintiff's request to notify everyone who may have received notice of the initial substantiation that DCF had reversed it. Plaintiff spent approximately $9,733.72 in attorney's fees and costs in appealing DCF's substantiation. *Id.* ¶ 33.

At all relevant times, Plaintiff was employed as the executive director of the Human Rights Defense Center and Prison Legal News. His job responsibilities include "advocating for the rights of prisoners by speaking at educational institutions," "media advocacy, and interactions with donors, supporters, and volunteers." *Id.* ¶¶ 36-37. As executive director, he encourages people to volunteer with the organization, many of whom are "high school and college students and some are minors." *Id.* ¶ 37.

Plaintiff has never applied for employment with a childcare facility, school, or health care facility in Vermont. He has also not applied for a home daycare license and has not applied to be a foster parent. He alleges no intent to pursue any of these activities. Throughout the events alleged in this suit, Plaintiff's rights with regard to his children have not changed, and his visitation with them was never suspended. Plaintiff's name was never placed on the Registry.

B. **Disputed Facts.**

The parties dispute whether Defendant Zumbruski refused to provide Plaintiff and his family law attorney with the specific allegations that precipitated the assessment. The parties also dispute whether Defendants Zumbruski and Kellett followed Vermont's statutory procedures before substantiating Plaintiff for child abuse. Plaintiff contends that DCF never opened an "investigation," under Vermont law and thus never undertook certain investigative steps, such as inspecting the scene of the alleged abuse, that are required for an "investigation" but not for an "assessment" because the latter does not result in a finding of abuse. See 33 V.S.A. §§ 4911-4923. Plaintiff further alleges that Defendants falsified evidence to cover up their failure to follow statutory procedures when they amended DCF's intake report to indicate that the matter was reassigned to an investigation. Plaintiff asserts that a June 16, 2010 email from Defendant Kellett indicates that approval for track reassignment was not received on June 3, 2010. The email states, in pertinent part:

> "There was no indication before the assessment commenced or during the assessment that it would lead to substantiation. . . . When [Zumbruski] put the information together, we met and then decided the information would support a substantiation of Emotional Maltreatment. At that point I didn't even think to explore if the track needed to be changed. If I missed that, I apologize. Should I change something at this point?"

(Doc. 46-1 at 7) (alterations in original) (quoting 46-21 at 2.)

Defendants counter that Vermont's statutory procedures were followed and they note that Defendants Keller, Kellett, and Zumbruski each testified that authorization for reassignment from an "assessment" to an "investigation" was received prior to substantiation. Although Defendant Keller could not recall the date of the conversation, she remembered the conversation in which it was approved and relied on outside documentation to determine that it occurred on June 3, 2010.

The parties further dispute whether Defendant Zumbruski mischaracterized certain statements made by C.W.'s school counselor; specifically, that C.W. "goes to talk to her a lot" and that the school did not believe C.W. should be spending time with his father.

8

(Doc. 39-3 at 4.) Plaintiff contends that these representations are false and notes that the school counselor denied making them in a letter sent to Defendant Keller. Defendants respond that, when deposed, the school counselor confirmed that C.W. talked with her "a lot" about hating Plaintiff, though she only met with C.W. twice. (Doc. 39-1 ¶ 21) (internal quotation marks omitted). They also point out that the school counselor never told Defendant Zumbruski that her statements reflected her personal opinions and not the official position of the school.

The final six paragraphs of Plaintiff's Statement of Disputed Facts deny and/or explain the specific allegations of abuse in the report. (Doc. 46-2 ¶¶ 39-44.) Defendants note that Plaintiff never communicated this information to Defendants, and the only evidence supporting these assertions is set forth in Plaintiff's Declaration. Plaintiff does not contend that he provided this evidence to DCF before its substantiation decision. Rather, he contends that if a hearing had been held prior to substantiation, he would have had an opportunity to present this evidence.

## II.     Conclusions of Law and Legal Analysis.

### A.      Standard of Review.

Summary judgment must be granted when the record shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, (1986) (internal quotation marks omitted). In deciding the motion, the trial court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party, and deny the motion if a rational juror could decide in favor of that party under the applicable law. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "There is no material fact issue only when reasonable minds cannot differ as to the import of the evidence before

the court." *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 51 (2d Cir. 1993).

### B.   Whether the Disputed Facts Preclude Summary Judgment.

Although there are several contested facts in this case, they are not material in a summary judgment determination because, even accepting Plaintiff's version of these facts as true, they do not preclude judgment as a matter of law in Defendants' favor. *See* Fed. R. Civ. P. 56(c) (providing that disputed issues of fact do not foreclose summary judgment if they are not material to the court's determination); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (explaining that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment [because] the requirement is that there be no *genuine* issue of *material* fact" and that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment [because] [f]actual disputes that are irrelevant or unnecessary will not be counted").

### C.   Plaintiff's Stigma Plus Claim.

Plaintiff argues that Defendants Kellett and Zumbruski deprived him of a constitutionally protected interest in his reputation by defaming him and imposing on him a legal duty to both defend himself against the substantiation of child abuse and respond to the motion in Family Court to suspend his visitation rights. He further argues that had he not appealed the substantiation, his employment *would have been* jeopardized. He contends that if the disputed facts are construed in his favor,

> [i]t is possible for a reasonable jury to conclude that the defendants wanted to assist plaintiff's ex-wife in overcoming his motion for medical decision making because she alleged she did not have money for counsel, and because plaintiff was questioning the appropriateness of medications prescribed by mental health professionals. A reasonable jury could conclude that the defendants substantiated him for abuse after an assessment, without a properly authorized investigation, and that, while contested family court parental rights and responsibilities litigation was pending, they provided a fraudulently manufactured substantiation letter to

>   his ex-wife and advised her to file it with a family court if she wanted to modify custody.

(Doc. 46-1 at 6.) He points out that "branding [a person] as a child abuser . . . certainly calls into question [his or her] 'good name, reputation, honor, or integrity.'" *Valmonte v. Bane*, 18 F.3d 992, 1000 (2d Cir. 1994), (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 573 (1972)).

Plaintiff, however, does not further claim that his rights and responsibilities with regard to his children, or his visitation, were altered by the allegedly false substantiation. Instead, he argues that his legal status was altered "because the defendants interfered in his family court proceedings by providing a false substantiation to his ex-wife, and . . . there is now a permanent state-created false public record of child abuse, which would not otherwise exist as a public record because such records are confidential by statute." (Doc. 46-1 at 13.) Plaintiff further alleges that he suffered a financial loss in terms of legal fees incurred in contesting "the state-sponsored public record of a false substantiation." *Id.*

Defendants counter that the statement that a reasonable person would believe that Plaintiff abused his children states an opinion rather than fact and that, in any event, the statement is true because there is ample evidence, including the statements of Plaintiff's children, which would cause a reasonable person to conclude that the abuse had occurred. Assuming *arguendo* that the statement is defamatory, Defendants argue that Plaintiff fails to identify a tangible, state-imposed burden on any protected interest. The court agrees.

Under the Due Process Clause of the Fourteenth Amendment, there is a right to be free from a false stigmatizing statement if it is coupled with the "deprivation of a tangible interest." *Algarin v. Town of Wallkill*, 421 F.3d 137, 138 (2d Cir. 2005); *see also Paul v. Davis*, 424 U.S. 693, 708-09 (1976) (requiring both the "stigma" resulting from a defamatory statement plus an alteration in legal status in order to find deprivation of a liberty interest warranting the safeguards of procedural due process). In *Vega v. Lantz*, the Second Circuit explained:

11

> To establish a "stigma plus" claim, a plaintiff must show (1) the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false, and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights. This state-imposed alteration of status or burden must be in addition to the stigmatizing statement. Thus, even where a plaintiff's allegations would be sufficient to demonstrate a government-imposed stigma, such defamation is not, absent more, a deprivation of a liberty or property interest protected by due process.

*Vega*, 596 F.3d 77, 81 (2d Cir. 2010) (internal quotation marks omitted). *Vega* thus imposes "a threshold requirement—the existence of a reputation-tarnishing statement that is *false*, *id.* at 82, as well as a requirement that the statement be "capable of being proved false[.]" *Id.* at 81; *see also Strasburger v. Bd. of Educ.*, 143 F.3d 351, 356 (7th Cir. 1998) ("True but stigmatizing statements that preclude further government employment do not support this type of claim. Nor do statements of opinion, even stigmatizing ones, if they do not imply false facts.").

In this case, the substantiation letter advised that an assessment into allegations of abuse was conducted and that, "**[b]ased on information we gathered, we have determined that a reasonable person would conclude that this abuse did occur.**" (Doc. 46-2 ¶ 20) (internal quotation marks omitted). Plaintiff contends that this is a statement of fact because "[a] government official's public statement that he or she has determined that a citizen has engaged in illegal conduct is a statement of fact, not opinion." (Doc. 46-1 at 10.) Plaintiff cites *Holmes v. Town of East Lyme*, 866 F. Supp. 2d 108 (D. Conn. 2012) for this proposition, but there a public official announced that the plaintiff was not being appointed to further government employment based upon an investigative report that revealed a "pattern and history" that "raised questions about the legitimacy about the request for payments that have been made" and thus the statements at issue were "not just statements of opinion, but [we]re accusations of theft of services which a reasonable juror could find sufficient for proof of a stigma plus violation." *Id.* at 126.

Here, as Defendants point out, the statement at issue present a closer question because what a reasonable person would conclude reflects "an evaluative process, a weighing of evidence, and a judgment call." (Doc. 39 at 14.) It would also be difficult to determine the truth or falsity of what a reasonable person would conclude where the record is not bereft of any evidence of possible child abuse but, instead, contains substantial evidence from a number of sources, including the children themselves, that arguably supports DCF's determination. Plaintiff's reliance on the fact that the substantiation was later reversed merely underscores the conclusion that, in this case, based upon the evidence provided to DCF at the time, reasonable minds could differ as to whether the alleged abuse occurred.

Whether a statement is opinion or fact is a question of law for the court. *See Mr. Chow of New York v. Ste. Jour Azur S.A.*, 759 F.2d 219, 224 (2d Cir. 1985) ("It is also clear that the determination of whether a statement is opinion or rhetorical hyperbole as opposed to a factual representation is a question of law for the court."). In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), the United States Supreme Court held that, "[u]nder the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Id.* at 339-340. The Court has since explained that "*Gertz* was [not] intended to create a wholesale defamation exemption for anything that might be labeled 'opinion.'" *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990). Instead, courts are instructed to consider whether a statement of "'opinion' . . . reasonably implies false and defamatory facts." *Id.* at 20. In other words, "[w]hen a statement fairly characterized as opinion implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it, it is a 'mixed opinion' and is actionable." *Flagler v. Trainor*, 2013 WL 5935097 at *7 (N.D.N.Y. Nov. 1, 2013) (other internal quotation marks omitted) (applying New York law); *see also Knelman v. Middlebury Coll.*, 898 F. Supp. 2d 697, 721-22 (D. Vt. 2012) (recognizing that a defamation claim may lie for a "'mixed' opinion" under Vermont law) (citing Restatement (Second) of Torts § 566 (1977) ("A defamatory communication may consist

13

of a statement in the form of an opinion, but a statement of this nature [is] actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.")).

In this case, although couched as an opinion regarding what a reasonable person would conclude, the statement clearly suggests a repository of facts, based upon information that DCF had gathered, that support a conclusion that the abuse occurred. The court, however, need not reach the thorny issue of whether the statement is opinion or fact, because, assuming *arguendo*, that it was both false and factual, Plaintiff cannot prove the "plus" part of his stigma-plus claim. *See Velez v. Levy*, 401 F.3d 75, 87 (2d Cir. 2005) (explaining that, by itself, "[a] free-standing defamatory statement . . . is not a constitutional deprivation, but is instead properly viewed as a state tort of defamation") (alterations in original) (internal quotation marks omitted).

The Second Circuit has held that to satisfy the "plus" prong, "deleterious effects which flow directly from a sullied reputation would normally . . . be insufficient. These would normally include the impact that defamation might have on job prospects, or, for that matter, romantic aspirations, friendships, self-esteem, or any other typical consequence of a bad reputation." *Valmonte*, 18 F.3d at 1001. As a result, "the damage [to one's reputation] must be accompanied by some significant deprivation." *O'Neill v. City of Auburn*, 23 F.3d 685, 691 n.2 (2d Cir. 1994).

There is no constitutional right to be free from an erroneous child abuse substantiation. *See Southerland v. City of New York*, 680 F.3d 127, 152 (2d Cir. 2012) (recognizing the competing interests between the parents and the government, the court explained that "'[a]n investigation [of child abuse] passes constitutional muster provided simply that case workers have a reasonable basis for their findings of abuse'") (quoting *Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 104 (2d Cir. 1999)); *see also Cornigans v. Mark Country Day Sch.*, 2006 WL 3950335, at *16 (E.D.N.Y. July 12, 2006) ("[W]ell-intentioned reports that are ultimately ruled unfounded are to be expected in the efforts to identify and combat child abuse.").

The majority of courts have further concluded that the "plus" element is not satisfied simply because a person is the subject of an investigation or even listed on a

child abuse registry. *See, e.g., Behrens v. Regier*, 422 F.3d 1255, 1260-61 (11th Cir. 2005) (acknowledging that inclusion on the child abuse registry was stigmatizing, but affirming the district court's dismissal of plaintiff's "stigma plus" claim because state law did not recognize any right to adopt an unrelated child, which was plaintiff's alleged "plus"); *Miller v. California*, 355 F.3d 1172, 1178-79 (9th Cir. 2004) (recognizing that plaintiffs identified a triable issue of fact regarding whether being falsely listed as a suspected child abuser was defamatory, but denying plaintiffs' "stigma plus" claim because plaintiffs experienced no change in legal status following the listing); *Glasford v. N.Y. State Dep't of Soc. Servs.*, 787 F. Supp. 384, 388 (S.D.N.Y. 1992) (dismissing plaintiff's "stigma plus" claim, explaining that the "complaint . . . does not allege that plaintiff's employment prospects suffered as a result of the report in the [child abuse register]").

In the instant case, the child abuse assessment and substantiation never resulted in a change in Plaintiff's legal status. The substantiation was ultimately reversed, and thus Plaintiff was never placed on the Registry. There were no changes to his rights and responsibilities with regard to his children. Although Plaintiff claims that being placed on the Registry would have prevented him from speaking at schools and recruiting volunteers as part of his current employment with a non-profit organization, he cites no authority for this claim and Vermont law is to the contrary. *See* 33 V.S.A. § 4919(a)(3) (restricting disclosure of those on the Registry to, *inter alia*, "an employer if such information is used to determine whether to hire or retain a specific individual providing care, custody, treatment, transportation, or supervision of children or vulnerable adults").[5]

Plaintiff's further claim that there is now a state-sponsored public record of the substantiation is undercut by the undisputed facts which reveal that Plaintiff's ex-wife, not DCF, filed the substantiation with the Family Court and nothing prevented Plaintiff from correcting the public record with his own filing. A suggestion that a document *may*

---

[5] The statute does not apply to Plaintiff's potential speaking engagements at schools because he would not be "providing care, custody," or "supervision of children." *Id.*

15

*be filed* in a pending court proceeding does not give rise to an injury "*by operation of law.*" *Valmonte*, 18 F.3d at 1001.

To the extent that Plaintiff claims the cost of appealing an erroneous substantiation decision satisfies the "plus" prong, his argument is unavailing. Plaintiff was not statutorily required to obtain counsel and could have represented himself in Family Court and before DCF's Child Abuse Registry Review Unit. As a result, the attorney's fees he incurred were not the result of a "state-imposed burden." *Vega*, 596 F.3d at 81 (internal quotation marks omitted).

As for Plaintiff's claim that DCF failed to follow statutory procedures and falsified its documentation of the alleged abuse, Plaintiff has no free-standing constitutional right to statutorily mandated procedures. "Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983). As a result, "state statutes do not create federally protected due process entitlements to specific state-mandated procedures." *Holcomb v. Lykens*, 337 F.3d 217, 224 (2d Cir. 2003). The alleged procedural flaws in DCF's investigative process therefore do not provide the requisite "plus" for Plaintiff's procedural due process claim. *See Patterson*, 370 F.3d at 336 ("[I]t is the plaintiff's reputational interest, and how that interest can [a]ffect his standing in the community *and his future job prospects*, that is at issue [in a stigma plus claim].") (emphasis supplied); *see also Balentine v. Tremblay*, 2014 WL 519653, at *3 (2d Cir. Feb. 11, 2014) (summary order) (holding that a "purported denial of process is not a 'plus'" and rejecting the plaintiff's attempt to "bootstrap his complaint by relying on the denial of a notice and a hearing for both the denial of procedural guarantees *and* the deprivation of his liberty or property right").

In summary, because Plaintiff cannot establish each essential element of his stigma plus claim, summary judgment in Defendants' favor is required. *See Celotex Corp.*, 477 U.S. at 323 (finding that "the moving party is 'entitled to a judgment as a matter of law'" where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof").

16

In light of the court's judgment as a matter of law in Defendants' favor on Plaintiff's procedural due process claim, the court does not reach Defendants' entitlement to qualified immunity although the court agrees with Defendants that it is available. As Defendants observe, "[n]o holding of the Second Circuit or the Supreme Court has ever found that merely defending against placement on a child abuse registry is [a] sufficient interest to invoke the due process protection of the Constitution." (Doc. 39 at 27.)

## CONCLUSION

For the reasons stated above, the court GRANTS Defendants' motion for summary judgment. (Doc. 39.)

SO ORDERED.

Dated at Rutland, in the District of Vermont, this 21st day of March, 2014.

*/s/ Christina Reiss*
_____
Christina Reiss, Chief Judge
United States District Court